[No. 41833-9-II. Division Two. September 25, 2012.]

CLARK COUNTY ET AL., *Appellants*, v. ROSEMERE NEIGHBORHOOD ASSOCIATION ET AL., *Respondents*.

860

*Anthony F. Golik, Prosecuting Attorney*, and *E. Bronson Potter* and *Christine M. Cook, Deputies*, for appellant Clark County.

*James D. Howsley* (of *Jordan Ramis PC*), for appellant/intervenor Building Industry Association of Clark County.

*Jan Erik Hasselman* and *Janette K. Brimmer* (of *Earthjustice*), for respondents Rosemere Neighborhood Association, Columbia Riverkeeper, and Northwest Environmental Defense Center.

*Robert M. McKenna, Attorney General*, and *Ronald L. Lavigne Jr., Senior Counsel*, for respondent Department of Ecology.

*Julie S. Nichols* on behalf of Building Industry Association of Washington, amicus curiae.

¶1 ARMSTRONG, J. — The federal "Clean Water Act"[1] and Washington statutes[2] require municipalities to adopt ordinances that reduce storm water runoff that flows through their sewer systems to discharge in streams and rivers. The Washington State Department of Ecology administers the federal act and monitors compliance with it. Under this authority, Ecology issues permits that set the standards for complying with the Clean Water Act. In January 2007, Ecology issued a "Permit"[3] that applied to Clark County (County). A major component of the Permit is a storm water flow control condition, which requires permittees to reduce storm water runoff from new development to the "historical" level at the site. Under the current Permit, a permittee can adopt an alternative storm water flow control program if the alternative program provides "equal or similar" protection to that specified in the Permit.

¶2 The County adopted its ordinances; Ecology found the County's ordinances were insufficient, and the two then

---

[1] We use this reference for clarity, but we recognize that the official name of the act is the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1387.

[2] The official name of Washington's water pollution act is the "Water Pollution Control Act," chapter 90.48 RCW.

[3] The official name of the permit is the National Pollution Discharge Elimination System Phase I Municipal Storm Water General Permit.

negotiated an "Agreed Order"[4] to bring the County into compliance with the Permit. The County entered the Agreed Order in January 2010. As modified by the Agreed Order, the alternative program required a developer to mitigate only for the increased flow caused by its development; the County would further mitigate flow back to its historic level. The County could fulfill its mitigation obligation by reducing flow on locations other than the property being developed, so long as those other locations met comparable acreage and land cover requirements.

¶3 Rosemere Neighborhood Association, Columbia Riverkeeper, and Northwest Environmental Defense Center (collectively Rosemere) challenged the Agreed Order before the Pollution Control Hearings Board (Board). The Board found the alternative program in the Agreed Order was not as protective as the permit standards, principally because it (1) allowed developments applied for between the Permit's expected effective date and the Agreed Order's actual effective date to escape the flow control requirements and (2) did not meet the "equal or similar" standard required for alternative programs. The County and the Building Industry Association of Clark County (Building Association) appeal the Board's decision, arguing that (1) the Board overstepped its authority, (2) the Board's decision will require the County to violate Washington's vesting law, (3) the Board failed to defer to Ecology's expertise on the "equal or similar" issue, and (4) lack of deference led to improper findings of fact. Because the Board acted within its authority, the Board's decision does not violate Washington's vesting doctrine, and evidence supports the Board's decision that the County's alternative program does not afford the protection the Permit requires, we affirm.

---

[4] The official name is Agreed Order No. 7323.

## FACTS

¶4 The Clean Water Act prohibits pollution of the nation's surface waters,[5] except where the discharge of pollutants complies with the act. 33 U.S.C. §§ 1311(a), 1342. The United States Environmental Protection Agency (EPA) regulates water quality by issuing permits to allow the discharge of pollutants into surface waters and can delegate this authority to a state agency. 33 U.S.C. §§ 1342, 1251(d). If the EPA delegates its authority, the state agency must enforce water quality standards that are equal to or better than the federal standards. 33 U.S.C. § 1342(b).

¶5 In Washington, the EPA has delegated its permitting power to Ecology. RCW 90.48.260(1)(a).[6] The permit at issue regulates water pollution discharges into municipal storm sewer systems. Storm water runoff through sewer systems is a significant contributor to the degradation of surface waters and, thus, is the focus of the permit regulations. Storm water runoff (1) carries chemicals from the ground into surface waters; (2) increases the volume of the surface water, which in turn increases stream channel erosion; and (3) adversely affects stream wildlife (e.g., salmon and its eggs). New construction and development increase storm water runoff by adding impervious surfaces to land that would otherwise allow water to naturally seep into the ground.

¶6 In January 2007, Ecology issued the Permit, which governs large western Washington municipalities that discharge storm water runoff into a sewer system. Because the County discharges storm water into a qualifying sewer system, it is a permittee and must comply with the Permit.

---

[5] The nation's waters include navigable waters and groundwater. We will refer to "surface waters" for simplicity.

[6] The legislature amended this statute in 2012. LAWS OF 2012, 1st Spec. Sess., ch. 1, § 313. Because the amendments do not materially affect our analysis, we refer to the current statute.

¶7 The Permit requires all permittees to create a storm water management program and sets out several conditions that a permittee must incorporate into its programs. At issue here are condition S5.C.5, controlling storm water runoff from new development and redevelopment (flow control), and condition S5.C.6, structural storm water controls (structural retrofit). The structural retrofit condition existed in previous versions of this Permit, but the flow control condition is new.

¶8 Under the flow control condition, a permittee must create a program that prevents and controls the impact of storm water runoff from new development, redevelopment, and construction site activity (development). Flow control projects may include (1) detention and retention ponds, which hold storm water runoff and release it at a slower rate, or (2) low impact development methods, such as rain gardens and pervious cement. The flow control condition requires permittees to control the high flow storm water runoff such that it matches the predeveloped (historical) discharge durations of the land.[7] For example, if the land being developed was historically forested land, the flow controls must reduce storm water runoff to the same level as when the property was forested. The Permit sets August 16, 2008, as the date by which permittees must pass ordinances creating a flow control program, which is 18 months after Ecology issued the Permit.

¶9 The structural retrofit condition requires permittees to construct storm water controls that prevent or reduce impacts from runoff that are not otherwise covered by specific conditions in the Permit. For example, many areas of developed land discharge into the sewer system but are not covered by the new flow control condition; thus, the permittee must construct projects to make up for that lack of control. Structural retrofit projects include anything

---

[7] The flow control requirement is to "match developed discharge durations to pre-developed durations for the range of pre-developed discharge rates from 50% of the 2-year peak flow up to the full 50-year peak flow." Ex. J-17, at 24.

from constructing a regional flow control facility to acquiring land to reforest.

¶10 A permittee may implement a different or more stringent program than the specific permit standards. To do so, the permittee must prepare a basin program or other similar scientific analysis to show that its alternative program will be "equal or similar" to the permit's standards. Ex. J-17, at 25, 28-29. A basin program generally determines the existing land cover and imperviousness, evaluates every stream channel in a basin, evaluates all drainage facilities in the basin, and analyzes the existing water quality in the basin.

¶11 In January 2009, the County adopted ordinances implementing its storm water management program; the ordinances became effective April 13, 2009. Ecology found that the County had not complied with the permit standards and issued a notice of violation in March 2009. In addition to the County's tardiness in passing its ordinances, Ecology stated that the County's flow control program was not "equal or similar" to the permit conditions. Ex. J-2, at 2. Based on the notice of violation, the County and Ecology negotiated a compliance agreement. On January 6, 2010, Ecology and the County entered into the Agreed Order, which Ecology believed brought the County into compliance with the permit terms because it was "equal or similar" to the Permit. Ex. J-1.

¶12 The Agreed Order is an alternative storm water control program. Under this alternative, the developer must control flow only to the "existing" condition at the site when it begins construction, rather than to the "historic[al]" level. *See* Ex. J-1, at 3-4. Then, the County is obligated to mitigate to the "historical" level of flow control. Ex. J-1, at 3-4. For example, if a developer builds on land that is currently prairie land but historically was forested land, the developer need only offset impacts of storm water runoff from its development project to prairie condition. The County must then mitigate the remaining storm water runoff impact to

the same level as when the land was forested. The County may construct its mitigation project at the development site itself or at another location within the same "[w]ater [r]esource [i]nventory [a]rea."[8] Ex. J-1, Attach. A at 8. The County must mitigate the same number of acres as are being developed by the private developer. The acreage is broken into three categories—effective impervious area, pastureland, and lawn/landscape. The County must track these three land cover categories at the development site and then "construct flow control facilities that, in total, serve an equal amount of these categories of existing land use cover."[9] Ex. J-1, at 4.

¶13 The Agreed Order allows the County to decide where the flow control efforts will be located and arguably allows strategic decisions based on where the most environmental benefit will be realized. The County uses two assessment tools to determine where to construct its flow control mitigation: the "Storm Water Needs Assessment Program" (Needs Assessment) and the "Stormwater Capital Improvements Program" (Capital Program). Under the Agreed Order, only development that vests after April 13, 2009, is subject to the new flow control requirements.

¶14 The Agreed Order does not change the County's obligation under the Permit's structural retrofit condition.

## PROCEDURE

¶15 Rosemere appealed to the Board, arguing that the Agreed Order's alternative program does not provide pro-

---

[8] "Watersheds" are defined as "the area draining into a river[,] lake or other surface water." The "Water Resource Inventory Area" was created by Ecology and other state agencies to "delineate the State's major watersheds." The County has only two water resource inventory areas. *My Watershed*, WASH. DEPARTMENT OF ECOLOGY, http://www.ecy.wa.gov/apps/watersheds/wriapages/index.html (last visited June 7, 2012).

[9] This concept of tracking the number of acres and types of land cover is referred to as the "acreage metric."

tection that is "equal or similar" to the Permit's standards.[10] The Building Association intervened in the appeal.

¶16 Rosemere and the County filed cross motions for partial summary judgment regarding the issue of vested projects. Specifically, Rosemere argued that the Agreed Order does not provide protection equivalent to the Permit because the Permit required the County to have its flow control program in effect by August 16, 2008, and the Agreed Order did not become effective until April 13, 2009. The County argued that under vesting principles, it could not make the Agreed Order effective before the April date, and the order provided protections equivalent to those of the Permit. The Board denied both motions, but it ruled generally that the flow control condition is not subject to the vested rights doctrine because it is an environmental rather than a land use regulation.

¶17 After a four-day hearing, the Board further ruled that the Agreed Order did not provide protection to surface waters that was "equal or similar" to the Permit.[11] 6 Administrative Record (AR) at 41. The Board found that the Agreed Order's alternative program was not based on scientific studies, such as basin programs, as the Permit requires. The Board also found that the Agreed Order's acreage metric for measuring the County's alternative obligation to mitigate did not account for soil and slope considerations in calculating a development's impact on the environment. And, the Board found that the Agreed Order allowed the County to place its mitigation controls anywhere within the same "water resource inventory area" without considering the development's specific environmental impact and whether the benefits gained by mitigat-

---

[10] Ecology subsequently formally amended the Permit to include the Agreed Order as a valid alternative program to the Permit. Rosemere appealed the permit modification. The Board ruled that the appeal for both the Agreed Order and the permit modification should be governed by the result of the first appeal. Thus, we refer to the Agreed Order and amended Permit that incorporates the Agreed Order provisions as one.

[11] One board member dissented in part.

ing elsewhere were comparable. The Board found ultimately that the acreage metric and the County's ability to choose the location were not based on science. Thus, the Board concluded the Agreed Order was not "equal or similar" to the permit requirements.

¶18 Additionally, the Board found that the Agreed Order did not require flow control for all development projects applied for between the Permit's effective date, August 16, 2008, and the Agreed Order's vesting date, April 13, 2009. Because of this gap in coverage, the Board concluded that the Agreed Order was not equivalent to the Permit.

¶19 The Board also found that in negotiating the Agreed Order, Ecology expected the County to increase its effort beyond its historical storm water runoff efforts. Specifically, Ecology expected that the County would continue its same level of effort for existing permit conditions, such as the structural retrofit condition, and then increase its efforts to comply with the new flow control conditions. Yet, the Board found that the Agreed Order did not require such increased effort. The Board concluded that the Agreed Order allowed the County to reduce its efforts on other permit conditions, which could lead to less overall environmental protection.

¶20 Finally, the Board found that the Agreed Order should have required the use of low-impact development methods to protect surface waters. For example, use of pervious surfaces reduces the amount of storm water runoff created by a new development and should have been used to meet the flow control condition. The Board concluded that because the Agreed Order failed to require the County to use low impact development practices, it fell short of the Permit's requirements. The County and the Building Association appeal the Board's decision.[12]

---

[12] The Building Industry Association of Washington filed an amicus curiae brief in this appeal.

## ANALYSIS

### I. Standard of Review

█ ¶21 Washington's Administrative Procedure Act, chapter 34.05 RCW, governs our review of Board decisions. *Port of Seattle v. Pollution Control Hearings Bd.*, 151 Wn.2d 568, 587, 90 P.3d 659 (2004). "The burden of demonstrating the invalidity of agency action is on the party asserting invalidity." RCW 34.05.570(1)(a).

¶22 The pertinent Administrative Procedure Act subsections under which we can grant relief here are:

(a) The order, or the statute or rule on which the order is based, is in violation of constitutional provisions on its face or as applied;

(b) The order is outside the statutory authority or jurisdiction of the agency conferred by any provision of law;

. . . .

(d) The agency has erroneously interpreted or applied the law;

(e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court . . . ;

. . . .

(i) The order is arbitrary or capricious.

RCW 34.05.570(3).

█ ¶23 We review the Board's interpretation of a statute de novo. *Port*, 151 Wn.2d at 587. When a statute is ambiguous and falls within Ecology's area of expertise, however, we give great weight to Ecology's interpretation if it is consistent with the statutory language. *Port*, 151 Wn.2d at 587.

██ ¶24 We review the Board's factual findings for substantial supporting evidence. *Port*, 151 Wn.2d at 588. Evidence is "substantial" if it is sufficient to persuade a fair-minded person of the truth or correctness of the finding. *Port*, 151 Wn.2d at 588. We defer to the Board's factual

findings and will overturn them only if they are clearly erroneous. *Port*, 151 Wn.2d at 588, 594. We will "not overturn an agency decision even where the opposing party reasonably disputes the evidence with evidence of 'equal dignity.'" *Ferry County v. Concerned Friends of Ferry County*, 121 Wn. App. 850, 856, 90 P.3d 698 (2004) (quoting *Honesty in Envtl. Analysis & Legislation (HEAL) v. Puget Sound Growth Mgmt. Hearings Bd.*, 96 Wn. App. 522, 530-31, 979 P.2d 864 (1999)). We review de novo the Board's application of law to the facts. *Port*, 151 Wn.2d at 588.

¶25 We will find an agency action arbitrary and capricious only if it is "'willful and unreasoning and taken without regard to the attending facts or circumstances.'" *Port*, 151 Wn.2d at 589 (internal quotation marks omitted) (quoting *Wash. Indep. Tel. Ass'n v. Wash. Utils. & Transp. Comm'n*, 149 Wn.2d 17, 26, 65 P.3d 319 (2003)). An agency action is not arbitrary and capricious where more than one reasonable opinion is possible and the agency acted with due consideration to the circumstances. *Port*, 151 Wn.2d at 589.

## II. JURISDICTION/AUTHORITY

¶26 The County argues that the Board overstepped its jurisdiction and authority by deciding issues regarding low impact development, structural retrofit, and vesting. Because the Board retains an implicit power to decide all issues necessary to effectively execute its power, we hold that the Board did not overstep its jurisdiction or authority in addressing these issues.

¶27 The scope of the Board's authority is a question of law that we review de novo. *See Ass'n of Wash. Bus. v. Dep't of Revenue*, 155 Wn.2d 430, 437, 120 P.3d 46 (2005). The Board has jurisdiction to hear and decide appeals from

orders issued by Ecology.[13] RCW 43.21B.110(1)(b).[14] The Board reviews Ecology's orders de novo. WAC 371-08-485(1).

¶28 An agency possesses " 'powers expressly granted to them and those necessarily implied from their statutory delegation of authority.' " *Ass'n of Wash. Bus.*, 155 Wn.2d at 437 (quoting *Tuerk v. Dep't of Licensing*, 123 Wn.2d 120, 124-25, 864 P.2d 1382 (1994)). More specifically, when the legislature grants an agency power, courts will infer that the grant includes " 'everything lawful and necessary' " to effectively execute the power. *Tuerk*, 123 Wn.2d at 125 (quoting *State ex rel. Puget Sound Nav. Co. v. Dep't of Transp.*, 33 Wn.2d 448, 481, 206 P.2d 456 (1949)).

¶29 Under the Permit, a permittee may create an alternative program to implement the Permit's required environmental protections, but the alternative program must provide "equal or similar" protection as the Permit. Ex. J-17, at 25, 28-29. The Agreed Order constitutes an alternative program. Thus, the question before the Board was whether the Agreed Order provided protection "equal or similar" to the Permit.

¶30 The legislature granted the Board explicit authority to adjudicate compliance orders issued by Ecology, and the Board uses a de novo standard in reviewing those orders. RCW 43.21B.110(1)(b); WAC 371-08-485(1). The Board also possesses the implicit authority to determine everything necessary to effectively adjudicate those orders. *See Tuerk*, 123

---

[13] Specifically, the Board can decide orders from Ecology made "pursuant to . . . RCW 90.48.120," and Ecology cited RCW 90.48.120 as its basis for entering the Agreed Order. RCW 90.48.120(1) reads in pertinent part:

Whenever, in the opinion of the department, any person shall violate or creates a substantial potential to violate the provisions of this chapter or chapter 90.56 RCW, or fails to control the polluting content of waste discharged or to be discharged into any waters of the state, the department shall notify such person of its determination by registered mail. . . . [T]he department shall issue such order or directive as it deems appropriate under the circumstances.

[14] The legislature subsequently amended this statute. Because the amendments do not change the substance of our discussion, we cite to the current version of the statute.

Wn.2d at 125. The Board explained that the Agreed Order failed to meet the "equal or similar" standard for several reasons, including that it (1) did not require use of low impact development techniques, (2) allowed for an impermissible reduction in structural retrofit efforts, and (3) used a vesting date that allowed developments applied for between the Permit's effective date and the Agreed Order's vesting date to escape the permit conditions. The Board could not determine whether the Agreed Order provided as much protection as the Permit without considering these specific issues. Limiting the Board's authority to those parts of the Permit expressly changed by the Agreed Order would require the Board to act without analyzing the actual impact of the Agreed Order in controlling storm water runoff.

¶31 We, therefore, reject the County's argument that the Board overstepped its authority in considering low impact development, structural retrofit, and vesting.

### III. Vesting

¶32 Both the County and the Building Association argue that the Board erred in ruling that the Permit's flow control conditions are not subject to Washington's vesting law. But this argument is based on two flawed assumptions. The first assumption is that if we uphold the Board's reversal, the County will be forced to place a more onerous burden on developers who applied during the time gap (i.e., mitigating to historical flow level) than the Agreed Order requires (i.e., mitigating to existing flow level). The second assumption is that the law in the County changed immediately after the Board's reversal of the Agreed Order to the more onerous permit standards. The first assumption requires us to speculate as to what storm water flow control program the County will ultimately adopt. The second assumption is unsupported by any legal authority. We accept neither assumption; thus, we need not address the hypothetical vesting issue.

¶33 The Agreed Order was entered in January 2010, but it became effective as of April 2009, which, in theory, would violate Washington's vesting law by increasing the burden to mitigate for those developers who applied between April 2009 and January 2010. Ex. J-1. Yet, the Building Association did not challenge the Agreed Order, most likely because a developer's mitigation obligation under the Agreed Order was less than the Permit could have required. Specifically, under the Agreed Order, a developer must mitigate only the increased storm water flow caused by its own development and the County assumes the obligation to mitigate to the historical level as required by the Permit. Ex. J-1, at 3-4. Nothing in the Permit or the Board's order requires the County to pass ordinances obligating the developers to incur the more onerous burden of mitigating to the historic levels.[15] Thus, the County may still choose to share the responsibility of mitigating the increased storm water run-off from a development site. If it does, the developers will enjoy the same benefits they received under the Agreed Order, and it is unlikely that any developer will complain about a vesting problem.

¶34 Furthermore, the Building Association cites no legal authority for the notion that the permit standards immediately became the law in the County when the Board invalidated the Agreed Order. The Permit requires *permittees* to pass ordinances that comply with permit standards. Until the County does so, its existing ordinances control. Ecology does have the power to challenge a permittee's attempt to comply with the permit standards; it did so with the County's first ordinances. RCW 90.48.120. But if the permit standards automatically became the law in the County, Ecology would then have the power to legislate for the permittees. Ecology claims no such power, and we can conceive of no legal basis for assuming it has such power.

---

[15] Although the Board found the Agreed Order less protective than the Permit, it did not criticize the County's core concept of sharing the mitigation burden with the developers.

Thus, we are unwilling to accept that the permit conditions became the law in the County when the Board invalidated the Agreed Order.

¶35 Because the record is insufficient to determine whether the County will ultimately enact ordinances that could violate vesting principles, and the Permit itself does not have the force of law in the County, we decline to address the legal vesting issue further.[16]

## IV. DEFERENCE

¶36 The County and the Building Association argue that the Board failed to afford the appropriate level of deference to Ecology's expertise. We disagree.

¶37 The Board should defer to Ecology on technical and scientific issues. *Port*, 151 Wn.2d at 595. Affording Ecology such deference, however, does not preclude the Board from engaging in de novo review of Ecology's decisions. WAC 371-08-485(1). Where the Board hears expert testimony contrary to the opinions of Ecology's experts, the Board has the power to weigh that evidence and determine the facts. *See Port*, 151 Wn.2d at 588, 623. Deferring to Ecology does not mean, as the County suggests, that the Board must accept Ecology's experts' opinions without weighing them against contrary expert testimony. *See generally Port*, 151 Wn.2d at 594-95.

¶38 In *Department of Ecology v. Public Utility District No. 1 of Jefferson County*, 121 Wn.2d 179, 199, 201-02, 849 P.2d 646 (1993) (*PUD No. 1 of Jefferson County*), the court reviewed the Board's finding that Ecology's stream flow conditions for a project were intended to "enhance" fishery protection rather than merely preserve the fishery as required by law. The testifying experts agreed that Ecology always intended to preserve the fishery rather than en-

---

[16] As we discussed above, however, the Board acted within its authority in deciding the factual vesting issue, and we analyze below the Board's factual findings on point.

hance it; most of the experts also testified that the conditions imposed likely would not enhance fishery protections. *PUD No. 1 of Jefferson County*, 121 Wn.2d at 201-02. Thus, the court held that the Board's decision was clearly erroneous because *unrefuted* testimony conflicted with the Board's decision regarding enhancement. *PUD No. 1 of Jefferson County*, 121 Wn.2d at 202, 204.

¶39 By contrast, the Board in this case heard expert testimony that contradicted Ecology's experts' opinions that the Agreed Order was equivalent to the Permit. For example, former Ecology employee Greg Winters testified that the Agreed Order was not "equal or similar" to the Permit because it did not require any particular level of effort to guarantee the same results as the Permit. Dr. Derek Booth testified that the Agreed Order failed on several levels, including that its alternative program was not supported by scientific analysis. Additionally, letters from the EPA and the National Marine Fisheries Service,[17] two agencies with experience in water pollution science, expressed serious concerns with the Agreed Order for its lack of "equal or similar" environmental protection. Ex. A at 22-23. Thus, several experts disagreed with Ecology's assessment of "equivalency."

¶40 The Board's power to conduct a de novo review allowed it to weigh the evidence and decide which experts were more credible. The evidence supports the Board's decision, and nothing in the record suggests that the Board failed to grant some deference to Ecology's expertise in resolving the conflicting views of the experts. Accordingly, we hold that the Board did not exceed its authority in disagreeing with Ecology's opinions.

---

[17] The National Marine Fisheries Service provides EPA with biological and technical advice.

## V. Findings of Fact

¶41 The County challenges several of the Board's findings of fact.[18]

¶42 We review the Board's factual findings for substantial evidence; we then consider de novo whether the factual findings support the legal conclusions. *Potelco, Inc. v. Dep't of Labor & Indus.*, 166 Wn. App. 647, 653, 272 P.3d 262 (2012). We will not reweigh the evidence or assess the credibility of the witnesses. *Port*, 151 Wn.2d at 588. We recognize, however, that deference is due Ecology because of its technical and scientific expertise. *Port*, 151 Wn.2d at 595.

## A. Alternative Program

¶43 The County and the Building Association challenge the Board's characterization of the Agreed Order as an alternative flow control program and its findings that the alternative program does not meet permit requirements for such programs. Additionally, the Building Association argues that the Board arbitrarily and capriciously increased the standards in the Permit for creating an alternative program by requiring a basin program or similar scientifically rigorous study to justify an alternative.

¶44 We agree with the Board's characterization of the Agreed Order as an alternative program, which the County could create only by complying with the Permit's requirement of a supporting basin program or similar scientific

---

[18] The County specifically claims that findings of fact 7, 12-13, 21, 25-28, 30, 32-35, 38-41, 50, and 53-54 are unsupported by substantial evidence. Although we do not address each separately, we address each of the specific arguments raised by the County. The County also argues that it should not be required to build flow control mitigation projects immediately after development starts but should be allowed to mitigate later as the Agreed Order provides. The Board, however, did not rely on this issue in ruling that the Agreed Order was not "equal or similar" to the Permit. Accordingly, we do not review the issue.

analysis.[19] Furthermore, the Board's findings that the Agreed Order does not meet the Permit's requirements for creating an alternative program are supported by substantial evidence. And, because the Board did not increase the Permit's requirements for creating an alternative program, it did not act arbitrarily and capriciously.

### i. Substantial Evidence

¶45 The Permit requires "use of basin programs or other similar water quality and quantity programming efforts" when permittees create an alternative program. Ex. J-16, at 11. County witnesses testified that under the Agreed Order, the County would use its Needs Assessment and Capital Program to determine which projects to pursue to meet its flow control mitigation obligations. All the experts, including those from the County, agreed that the Needs Assessment and Capital Program do not qualify as basin plans or equivalent scientific analysis. Thus, substantial evidence supports the Board's finding that the alternative program created by the Agreed Order does not comply with the Permit's explicit terms requiring a basin program or similarly rigorous programming tool.

### ii. Arbitrary and Capricious

¶46 An agency's decision is arbitrary and capricious where the agency action " 'is willful and unreasoning and taken without regard to the attending facts or circumstances.' " *Port*, 151 Wn.2d at 589 (internal quotation marks omitted) (quoting *Wash. Indep. Tel. Ass'n*, 149 Wn.2d at 26). Here, the Permit requires a basin program or "similar water . . . programming effort[ ]." Ex. J-16, at 11. "Similar"

---

[19] The Agreed Order is materially different from the permit standards and clearly presents an alternative program. It allows a sharing of the burden to mitigate between developers and the County and measures the comparability of the County's off-site mitigation efforts by using an acreage metric; in contrast, the Permit takes into account infiltration of soil and other environmental impacts from storm water runoff in creating a flow control program. The County also concedes that its program must afford protection "equal or similar" to that of the Permit—a concept that applies only to "alternative programs."

is defined as "having characteristics in common : very much alike." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2120 (2002). A basin program is a detailed scientific assessment of existing conditions that may affect water quality in a particular water basin. Thus, the Board did not arbitrarily or capriciously increase the permit standards by requiring the alternative program to be based on a basin program or similarly rigorous scientific effort.

B. Acreage Metric/Location of Mitigation

¶47 The County next argues that the Board erred in finding that the acreage metric used to calculate the County's mitigation obligation is not based on science and that the method of locating mitigation projects affords less protection than the Permit.

¶48 The Board found that both the acreage metric and the County's discretion in locating mitigation projects fail to "address equivalent impacts to the environment and beneficial uses, lack a scientific basis and [are] inconsistent with directives to protect beneficial uses." 6 AR at 19. Thus, the Board concluded that because the acreage metric and mitigation location decisions do not consider the environmental impacts of a particular development site, the Agreed Order is not "equal or similar" to the Permit.

¶49 Although the County is correct that testimony from Douglas Beyerlein, a water science expert, shows some scientific basis for the acreage metric used in the Agreed Order, the County's argument still fails. Ecology determined that the acreage metric provides "equal or similar" protection as the Permit, but it also recognized that impacts from storm water runoff are "highly site-specific and vary geographically due to differences in local land use conditions, hydrologic conditions, and the type of [surface] water." Ex. J-15, at 8. Greg Winters testified that the acreage metric is purely mathematical and fails to consider the development site's actual environmental impacts (i.e., soil type, slope, vegetation, etc.). Dr. Booth also disagreed with

Ecology's assessment that the acreage metric is "equal or similar" to the Permit. He opined that the acreage metric is "critically flawed" and explained that the approach does not account for the actual impacts on the environment from the development; nor does it account for variations in landscape from site-to-site. 4 AR at 16-17. Dr. Booth's conclusions are supported by the National Marine Fisheries Service's opinion that the acreage metric "is not supported by the best available science." Ex. A-23, at 3. Although the Board's broad statement that the mitigation metric "rests on no science" is incorrect, the ultimate finding that the "acreage metric is fundamentally flawed" is supported by substantial evidence. 6 AR at 19-20.

¶50 Dr. Booth also explained that because the Agreed Order lacks guarantees and standards for locating mitigation projects, it is not "equal or similar" to the Permit. The Permit requires mitigation projects to be as close as possible to where the harm is created; the Agreed Order allows mitigation anywhere in the water resource inventory area—a broad category. Dr. Booth explained that the Agreed Order allows development in the most ecologically valuable watersheds but then it allows the County to mitigate in the least ecologically important areas. The National Marine Fisheries Service agreed that allowing mitigation anywhere within the same water resource inventory area fails to consider the different ecosystems and watershed conditions affected by development. Thus, substantial evidence supports the Board's findings that the Agreed Order is less protective than the Permit because it allows the County to mitigate at locations not comparable to the development site.

C. Harm to Surface Waters

¶51 The County also argues that the Board erred in finding that the actual harm to the surface waters under the Agreed Order is worse than under the Permit.

¶52 The Board found that the Agreed Order did not incorporate several of the protections found in the Permit. Thus, the Board concluded that

> there are neither criteria applied at the front end, nor evaluation and monitoring results that can be reviewed at the back end, that require, or will demonstrate that the flow control implemented by the county will achieve the same level of protection of beneficial uses that flow control at new development or redevelopment sites will achieve.

6 AR at 50.

¶53 Experts testified that the permit standards do not actually eliminate pollution; rather, the intent of the permit standards is to begin *improving* water quality in surface waters. The County relies on this testimony to argue that the Board erred in finding that the Agreed Order does not protect against the same harms as the Permit. Dr. Booth explained, however, that although the permit standards are not going to correct the already degraded waters, the standards contribute to slowing water pollution. He testified that the Agreed Order allows the County to locate mitigation projects based on a cost-benefit analysis; thus, it is not "equal or similar" to the permit standards for slowing damage. Additionally, Winters specifically testified that the "approach laid out in the Agreed Order offers less environmental protection and less certainty of effective implementation than the Phase I permit." 4 AR at 8-9.

¶54 Again, substantial evidence supports the Board's finding that the Agreed Order does not provide "equal or similar" protection to surface waters as the Permit does.

D. Retrofit Conditions

¶55 The County argues the Board erred in ruling that the Agreed Order allowed an impermissible reduction in structural retrofit efforts. The County reasons that because the Agreed Order does not change the structural retrofit

conditions, it is obligated to comply with all permit provisions unmodified by the Agreed Order.[20]

¶56 The Board found that the Agreed Order does not require the County to maintain its structural retrofit program *and* add the new flow control program. The Board also found that assessing the County's level of effort and expenditures on both conditions was nearly impossible because it has different ways of tracking the information and the project "efforts are in a continuing state of flux." 6 AR at 34-35. And the Board was not persuaded by the County's assertion that it can sustain its spending on both conditions. Thus, the Board concluded that it is unlikely to meet its obligation under the structural retrofit condition because the funding is inadequate to sustain it *and* the flow control condition, resulting in an impermissible reduction in at least one condition—likely structural retrofit. Ultimately, the Board concluded that under the Agreed Order, the "County can and has engaged in an impermissible reduction in the level of effort required under the structural retrofit program, by splitting and shifting available funds to the new mitigation requirements of the [Agreed] Order." 6 AR at 42.

¶57 Substantial evidence supports the Board's finding that the Agreed Order does not require a sustained effort in its structural retrofit program. Ecology's experts admitted that the Agreed Order did not require the County to maintain its funding and effort level for the structural retrofit. "It is true that the County is adding a new burden. . . . Since we do not have a separate, minimum performance standard . . . we may end up getting less

---

[20] The County claims that the Board "erroneously applied the law to the facts, made findings that were unsupported by substantial evidence, exceeded its jurisdiction, and acted in a manner that was arbitrary and capricious" when deciding this issue. Br. of Appellant Clark County at 26. We have addressed the jurisdiction issue, *supra* Part II. And, the County provides no argument as to how the Board erroneously applied the law to the facts or acted arbitrarily and capriciously; thus, we address only whether substantial evidence supports the Board's structural retrofit findings. RAP 10.3.

overall improvements than if the default standard was met at development sites." Ex. A-48. Additionally, Ed O'Brien, from Ecology, testified that he assumed the County would maintain the same level of effort in the program.

¶58 Substantial evidence also supports the Board's finding that it is difficult to assess the County's efforts toward the structural retrofit program. The County's funding for permit obligations comes from its "Clean Water Fund." Currently, the Clean Water Fund has a surplus of nearly $8 million. The County has adopted no additional funding sources to create and maintain the new flow control condition. Kevin Gray, the environmental services director for the County, testified that spending on structural retrofit totals approximately $800,000 per year and the County can and will continue this level of spending and effort. On the other hand, Rod Swanson, the permit manager for the County, testified that the County should be able to cover its obligations for three to four years and thereafter county commissioners will have to find another funding source. Exhibits further exemplify the confusion in the County's expenditure for both conditions. For example, when comparing money spent on structural retrofit projects, the County's Exhibit A-43 showed $1.7 million in 2008 and $2 million in 2009. But Exhibit A-74 shows a total of $3.7 million for 2008 and $500,000 for 2009.[21]

¶59 Although the evidence may not show the County actually reduced its effort in its structural retrofit program, substantial evidence supports the Board's finding that the County intended to "shift" projects. Ex. J-6, at 17. Some projects the County originally labeled as "structural retrofit projects" it later relabeled as "flow control mitigation projects." For example, in its 2009 report to Ecology, the County labeled project "NE 152nd St." as a structural retrofit

---

[21] Later testimony clarified that exhibit A-74 shows the entire cost of a project if it is completed in that year, instead of the costs spent in that particular year. This clarification, however, does not resolve the confusion of whether the County can maintain its spending and effort level for the structural retrofit condition.

project it intended to build in 2009. Ex. J-6, Attach. A at 17. Then in 2010, the County labeled that same project as a "flow control" mitigation project. One county representative testified that the "NE 152nd St." project was a good example of one that was relabeled. Further, the County identified only one structural retrofit project for 2011 and 2012, although in previous years it had identified a number of such projects. And evidence shows the County may have programmed to make up its deficit in flow control mitigation by shifting projects and money from the structural retrofit program.

¶60 Moreover, both the EPA and National Marine Fisheries Service expressed concerns that the Agreed Order did not require the County to maintain current spending and effort levels for its structural retrofit program. The EPA recognized that the Permit does not define specific quantitative levels of effort for structural retrofit, but permittees should not be allowed to "significantly reduce long standing investment" toward the structural retrofit condition. Ex. A-22, at 1-2. And the EPA was concerned that the Agreed Order allowed the County to impermissibly reduce its funding of its structural retrofit program in order to offset deficiencies in the flow control mitigation area. Ultimately, the EPA suggested adding provisions to the Agreed Order to ensure it is "equal or similar" to the permit requirements, such as explicitly requiring the County to not appreciably reduce its structural retrofit program.

¶61 Finally, the Board's conclusions are supported by the above findings. The Permit does not allow lesser protection than required by previous Permits. 33 U.S.C. § 1342(o). Previous Permits required a structural retrofit program. Thus, the current Permit's structural retrofit condition requires at least the same protection as given under prior versions. 33 U.S.C. § 1342(o). The Board properly concluded that the County's relabeling of projects and the Agreed Order's failure to require the same or an increased effort failed to provide protection "equal or similar" to the permit standards.

¶62 Thus, the record supports the Board's findings and conclusions regarding structural retrofit.

E. Vesting

¶63 The County also argues that the Board erred in addressing the Agreed Order's vesting date.

¶64 The Board found that the Permit does not require permittees to implement the Permit's standards by a certain date. The Permit was clear, however, that permittees had to pass flow control ordinances by August 16, 2008—18 months after the Permit was issued. Further, the Board found that permittees had to implement such ordinances by November 2008, 90 days after August 16. Thus, the Board concluded the Agreed Order failed to provide "equal or similar" protection as the Permit did because the Agreed Order's April 2009 vesting date allowed many developments that would be captured by the permit flow control conditions to escape the new requirements.

¶65 The EPA sent Ecology a letter expressing concerns with the vesting date. The EPA stated that it was concerned that the vesting date "provides less cumulative flow control over the term of the [P]ermit relative to the Phase I Permit requirements." Ex. A-22, at 2. The National Marine Fisheries Service also wrote Ecology, expressing its disapproval of the vesting date. Specifically, the National Marine Fisheries Service stated that there is "no scientific justification or permit condition" supporting the lack of mitigation between August 2008 and April 2009. Ex. A-23, at 5. And Dr. Booth explained that the delay in implementing the flow control conditions could have significant impacts on the water quality in Clark County. The evidence showed that the cost for the County to construct flow control mitigation for all the projects applied for between August 16, 2008, and April 13, 2009, would have been nearly $8 million. Although this assumes that all the developments applied for during that time would actually be constructed, it still shows a significant loss of environmental protection because of the time

gap. Thus, substantial evidence supports the Board's findings that the vesting date is not "equal or similar" to the permit protections, and its conclusions flow from those findings.

¶66 In conclusion, we hold that all of the Board's findings are supported by substantial evidence in the record and its conclusions reasonably flow from those findings.

## VI. CONSTITUTIONAL AND STATUTORY ISSUES

¶67 The Building Association argues that the Board's decision reversing the Agreed Order creates an as-applied constitutional takings problem under both the United States Constitution and Washington State Constitution. Also, according to the Building Association, the Board's reversal puts the County in the position of imposing an impermissible fee under RCW 82.02.020.[22] Because this issue is not procedurally before us and is not ripe for review, we do not address it.

¶68 RCW 43.21B.230(1) allows the Board to hear cases where a party "commence[s] an appeal . . . by filing a notice of appeal with the board within thirty days from the date of receipt of the decision being appealed." Thus, the Board can consider issues only if filed in a timely manner. Here, the question before the Board related to the Agreed Order itself and its sufficiency, which necessarily assumes the Permit is lawful and meets the federal and state requirements for water quality protection. The Building Association's constitutional takings and statutory fee arguments, however, essentially challenge the Permit itself.

---

[22] The current version of RCW 82.02.020 reads in pertinent part:

Except as provided in RCW 64.34.440 and 82.02.050 through 82.02.090, no county, city, town, or other municipal corporation shall impose any tax, fee, or charge, either direct or indirect, on the construction or reconstruction of residential buildings, commercial buildings, industrial buildings, or on any other building or building space or appurtenance thereto, or on the development, subdivision, classification, or reclassification of land.

We cite the current version despite amendments because the legislature's changes to the statute do not change our analysis here.

The Building Association argues that if the County must implement the default standards in the Permit, then the County will be forced to engage in unconstitutional takings and impose fees that are prohibited by statute. But the issue of whether the permit standards create such a situation should have been appealed when the Permit itself was appealable.[23] Former RCW 43.21B.230 (2004) (allows the Board to hear cases where a party "appeal[s] to the hearings board, within thirty days from the date of receipt of the . . . order").[24] Thus, these issues are not properly before us in the appeal of the Agreed Order.

 ¶69 Moreover, the issues of constitutional takings and improper fees are not ripe for review. A controversy is ripe when

> (1) an actual, present and existing dispute, or the mature seeds of one, as distinguished from a possible, dormant, hypothetical, speculative or moot disagreement, (2) between parties having genuine and opposing interests, (3) which involves interests that are direct and substantial rather than potential, theoretical, abstract or academic, and (4) a judicial determination of which will be final and conclusive.

*Bellewood No. 1, LLC v. LOMA*, 124 Wn. App. 45, 49-50, 97 P.3d 747 (2004). As discussed above, nothing in the Board's decision requires the County to abandon its concept of sharing the mitigation burden with developers. Until the County adopts new ordinances, we would be speculating about possible unconstitutional takings or violations of

---

[23] The Permit issued January 17, 2007; thus a timely appeal would have been filed 30 days thereafter. Several parties did appeal the Permit itself, but the possibility of a constitutional taking or improper imposition of fees apparently did not come up during that litigation. *Puget Soundkeeper Alliance v. Dep't of Ecology*, Nos. 07-021, 07-026, 07-027, 07-029, 0-030, 07-037, 2008 WL 5510413 (Wash. Pollution Control Hr'gs Bd. Aug. 7, 2008). The County did participate in the appeal of the Permit. *Puget Soundkeeper Alliance*, 2008 WL 5510413. The Building Association did not participate in that appeal.

[24] The statute was amended in July 2010. Although there are changes to the section at issue here, the 30 day rule still applies for filing an appeal.

RCW 82.02.020. Thus, there is no "actual or present" controversy before us. We decline to address these issues.

¶70 We affirm.

Hunt and Penoyar, JJ., concur.

Review denied at 176 Wn.2d 1021 (2013).