# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| SNOHOMISH COUNTY, KING COUNTY, and BUILDING INDUSTRY ASSOCIATION OF CLARK COUNTY, | No. 46378-4-II |
| Appellants, | |
| v. | |
| POLLUTION CONTROL HEARINGS BOARD, and WASHINGTON STATE DEPARTMENT OF ECOLOGY, and PUGET SOUNDKEEPER ALLIANCE, WASHINGTON ENVIRONMENTAL COUNCIL, and ROSEMERE NEIGHBORHOOD ASSOCIATION, | PUBLISHED OPINION |
| Respondents. | |

MAXA, J. — Snohomish County, King County, and the Building Industry Association of Clark County (collectively, appellants) appeal the Pollution Control Hearings Board's (Board) order holding that condition S5.C.5.a.iii in the 2013-2018 Phase I Municipal Stormwater Permit (the 2013-2018 Permit) issued by the Washington Department of Ecology (Ecology) does not violate the vested rights of property developers. The 2013-2018 Permit requires Phase I permittees, which include certain counties and cities, to adopt by June 30, 2015 regulations for controlling stormwater drainage and runoff to municipal stormwater sewer systems for new development, redevelopment, and construction activities. Condition S5.C.5.a.iii provides that

the new regulations will apply to all development applications submitted after July 1, 2015 and submitted before July 1, 2015 if construction is not started by June 30, 2020.

The statutory vested rights doctrine provides that a land use application generally must be considered under the zoning or other land use control ordinances in effect at the time the application was submitted. The appellants argue that enforcement of condition S5.C.5.a.iii would require permittees to violate the vested rights of developers because (1) the required stormwater regulations are land use control ordinances, (2) an application submitted before July 1, 2015 might not result in the start of construction by June 2020, and (3) condition S5.C.5.a.iii therefore might require counties to enforce stormwater regulations adopted after an application is submitted.

Ecology and Puget Soundkeeper Alliance (PSA) (collectively, Ecology) argue, and the Board ruled, that the 2013-2018 Permit would not require permittees to violate the vested rights doctrine because the required regulations are environmental regulations, not land use control ordinances. They also argue that even if the regulations are land use control ordinances, federal law preempts Washington's vested rights statutes.

We hold that (1) the 2013-2018 Permit's required stormwater regulations are "land use control ordinances" under the vested rights statutes, (2) enforcement of condition S5.C.5.a.iii would violate the statutory vested rights of developers who submit applications before July 1, 2015 but do not begin construction until after June 30, 2020, and (3) federal law does not preempt Washington's vested rights statutes. Accordingly, we reverse the Board's order and remand to the Board to direct Ecology to revise condition S5.C.5.a.iii to specify that the 2013-2018 Permit applies only to those completed applications submitted after July 1, 2015.

FACTS

The federal Clean Water Act (CWA)[1] prohibits any discharge of pollutants into the nation's waters, unless the discharge is made according to the terms of a permit issued under the National Pollution Discharge Elimination System (NPDES). 33 U.S.C. §§ 1311(a), 1342. The federal Environmental Protection Agency (EPA) may issue NPDES permits, but it may also delegate the authority to issue permits to a state agency. 33 U.S.C. § 1342(a)(1), (b). In Washington, EPA has delegated the authority to issue NPDES permits to Ecology. *See* RCW 90.48.260.

*2013 Municipal Stormwater Permit*

In August 2012, Ecology issued the 2013-2018 Phase I Municipal Stormwater Permit.[2] The 2013-2018 Permit authorizes and regulates the discharge of stormwater to surface waters and to ground waters from large and medium municipal separate storm sewer systems, referred to as MS4s.[3] Snohomish County, King County, Pierce County, Clark County, and the cities of Seattle and Tacoma are among the entities that are permittees under the 2013-2018 Permit.[4] The 2013-2018 Permit is effective from August 1, 2013 through July 31, 2018.

---

[1] The Clean Water Act's formal name is the Water Pollution Control Act. 33 U.S.C. § 1251 et seq.

[2] The 2013-2018 Permit is the third Phase I municipal stormwater permit issued in Washington. Ecology issued the first such permit in 1995 and the second in 2007.

[3] The Board described MS4s as "all the conveyances or systems of conveyances that are designed or used for collecting or conveying stormwater, including roads with drainage systems, municipal streets, catch basins, curb gutters, ditches, manmade channels or storm drains." Clerk's Papers at 32-33.

[4] Ecology also regulates stormwater discharges from small municipalities with two Phase II permits. Neither of the Phase II permits are at issue in this appeal.

Ecology implements the 2013-2018 Permit at the local level by mandating that each local permittee be responsible for compliance with the 2013-2018 Permit's terms.  The 2013-2018 Permit requires all permittees to create a stormwater management program.  That program must include the enactment of local ordinances or other governing documents regulating development within each permittee's jurisdiction.  The 2013-2018 Permit requires several conditions that permittees must implement through their ordinances.  Condition S5.C.5 is one such condition.

Condition S5.C.5 focuses on preventing and controlling stormwater runoff from new development, redevelopment, and construction activities.  This condition applies to those projects that meet certain thresholds specified in Appendix 1 of the 2013-2018 Permit[5] and that will discharge stormwater into an applicable sewer system.

Condition S5.C.5 includes a lengthy set of minimum performance measures, one of which includes site and subdivision scale requirements implementing the "[m]inimum [r]equirements, thresholds, and definitions" in Appendix 1 of the 2013-2018 Permit for new development, redevelopment, and construction sites.  Site and subdivision scale requirements that developers must implement include preparing stormwater site plans; drafting stormwater pollution prevention plans; utilizing all known, available, and reasonable source control best management practices; maintaining natural drainage patterns to the maximum extent practicable; and implementing on-site stormwater management best management practices to the extent feasible in various contexts.   In addition, certain projects trigger additional minimum

_____

[5] The applicability of the 2013-2018 Permit's minimum requirements depends on the development project's type and size.  Certain project types are expressly exempted from the 2013-2018 Permit's requirements.

requirements that developers must comply with. These include constructing stormwater treatment facilities to treat stormwater runoff, implementing flow control standards to reduce the impacts of stormwater runoff, ensuring that projects draining into wetlands comply with various guide sheets and construction restrictions, and maintaining an operation and maintenance manual.

Condition S5.C.5.a.iii provides that permittees must adopt and make effective a stormwater management program that meets the 2013-2018 Permit requirements no later than June 30, 2015. The second sentence of the condition addresses the applicability of the new program to development projects:

> The local program adopted to meet the requirements of S5.C.5.a.i through ii shall apply to all applications submitted after July 1, 2015 and *shall apply to projects approved prior [to] July 1, 2015, which have not started construction by June 30, 2020*.

Certified Appeal Board Record (CABR) at 27 (emphasis added) (footnotes omitted).

*Procedural History*

Snohomish County, King County, Pierce County, Clark County, and the Building Industry Association of Clark County appealed the 2013-2018 Permit to the Board.[6] They argued in part that the 2013-2018 Permit's requirements were land use control ordinances and that condition S5.C.5.a.iii conflicted with Washington's vested rights and finality laws. Ecology argued that the requirements under the 2013-2018 Permit were environmental regulations that

---

[6] The City of Seattle, City of Tacoma, and the Washington State Department of Transportation received permission to intervene in the appeals. Puget Soundkeeper Alliance, Washington Environmental Council, and Rosemere Neighborhood Association (collectively PSA) also received permission to intervene on behalf of Ecology.

were necessary to comply with the federal CWA and state Water Pollution Control Act, and therefore did not implicate the vested rights doctrine.

In October 2013, the Board issued a summary judgment order ruling that the 2013-2018 Permit's requirements were environmental regulations and therefore that condition S5.C.5.a.iii did not violate Washington's vested rights doctrine or finality doctrine. The Board stated that it "has consistently ruled that the requirements imposed by NPDES stormwater permits are not land use control ordinances that are subject to state vesting laws." Clerk's Papers (CP) at 56. Moreover, the Board rejected the notion that the doctrines of vested rights and finality of land use decisions could control and limit the application of state and federal water quality requirements.

However, the Board's summary judgment order did require Ecology to modify the second sentence of condition S5.C.5.a.iii. The Board directed Ecology to replace the phrase "projects approved" with "application submitted."

Following a trial on the remaining issues in the case, the Board issued its final decision and order. The appellants separately appealed the Board's October 2013 decision to the Thurston County Superior Court. Thurston County consolidated the appeals. The appellants sought direct review, which this court granted.

ANALYSIS

A.      STANDARD OF REVIEW

The Administrative Procedures Act (APA) governs our review of Board decisions. *See* RCW 34.05.570(1)(b); *Cornelius v. Dep't of Ecology*, 182 Wn.2d 574, 584-85, 344 P.3d 199 (2015). We apply the APA to the administrative record. *Cornelius*, 182 Wn.2d at 585. We may

grant relief from an order based on several reasons listed in RCW 34.05.570(3), including that the order is (1) outside the statutory authority of the agency, and (2) based on an erroneous interpretation or application of the law. RCW 34.05.570(3)(b), (d). The burden of demonstrating the invalidity of agency action is on the party asserting invalidity. RCW 34.05.570(1)(a).

We review questions of law de novo. *Cornelius*, 182 Wn.2d at 585. When a statute is ambiguous and falls within Ecology's area of expertise, we give great weight to Ecology's interpretation if it is consistent with the statutory language. *Clark County v. Rosemere Neigh. Ass'n*, 170 Wn. App. 859, 871, 290 P.3d 142 (2012). However, we are not bound by an agency's interpretation of a statute. *See* RCW 34.05.570(3)(d); *see also . Postema v. Pollution Control Hr'gs Bd.*, 142 Wn.2d 68, 77, 11 P.3d 726 (2000). The Board's order was made on summary judgment, which we also review de novo. *Cornelius*, 182 Wn.2d at 585.

B.      CONFLICT BETWEEN CONDITION S5.C.5.a.iii AND VESTED RIGHTS DOCTRINE

The appellants challenge the second sentence of condition S5.C.5.a.iii, which requires permittees to apply the new stormwater regulations to property development applications filed before July 1, 2015 if construction on those projects has not started by June 30, 2020. The appellants focus specifically on the application of the new stormwater regulations to local building permit and subdivision applications and development agreements. They argue that condition S5.C.5.a.iii conflicts with the statutory vested rights doctrine. We agree.

1.      Vested Rights Doctrine

The vested rights doctrine generally provides that certain land development applications must be processed under the land use regulations in effect when the application was submitted,

regardless of subsequent changes to those regulations. *Town of Woodway v. Snohomish County*, 180 Wn.2d 165, 172-73, 322 P.3d 1219 (2014). Development rights "vest" on a date certain – when a complete development application is submitted. *Id.* The purpose of the vested rights doctrine is to provide certainty to developers and to provide some protection against fluctuating land use policy. *Noble Manor Co. v. Pierce County*, 133 Wn.2d 269, 278, 943 P.2d 1378 (1997). The doctrine recognizes that development rights are valuable property interests and ensures that new land use regulations do not interfere with those rights. *Town of Woodway*, 180 Wn.2d at 173.

The vested rights doctrine originated at common law, but the legislature has codified the doctrine with regard to building permits (RCW 19.27.095(1)), subdivision applications (RCW 58.17.033(1)), and development agreements (RCW 36.70B.180).[7] *Town of Woodway*, 180 Wn.2d at 173. RCW 19.27.095(1) provides that a valid and fully complete building permit application "shall be considered under the building permit ordinance in effect at the time of application, and the zoning or other land use control ordinances in effect on the date of application." RCW 58.17.033(1) provides that a proposed division of land "shall be considered under the subdivision or short subdivision ordinance, and zoning or other land use control

---

[7] A question exists as to whether the vested rights doctrine now is purely statutory or continues to evolve in the common law. The Supreme Court in *Town of Woodway* stated without discussion that "the vested rights doctrine is now statutory." 180 Wn.2d at 173. Division One of this court also has held that the vested rights doctrine is purely statutory. *Potala Vill. Kirkland, LLC v. City of Kirkland*, 183 Wn. App. 191, 203-214, 334 P.3d 1143 (2014) (discussing the evolution of the vested rights doctrine and applying its holding that the doctrine is purely statutory). The appellants limit their arguments to the vested rights statutes, and none of the parties argue that we should address any common law vested rights doctrine. Therefore, we analyze only the vested rights statutes.

ordinances, in effect on the land at the time a fully completed application for preliminary plat approval of the subdivision, or short plat approval of the short subdivision, has been submitted to the appropriate county, city, or town official." And RCW 36.70B.180 provides that a development agreement is not subject to an amended or new "zoning ordinance or development standard or regulation adopted after the effective date of the agreement."

The issue here is whether the 2013-2018 Permit's required stormwater regulations constitute "other land use control ordinances" under RCW 19.27.095(1) and RCW 58.17.033(1) and/or "development standard[s] or regulation[s]" under RCW 36.70B.180. If so, the statutory vested rights doctrine applies to those stormwater regulations. If not, the vested rights doctrine does not apply.

2. Principles of Statutory Construction

Determining whether the statutory vested rights doctrine applies to the 2013-2018 Permit's required stormwater regulations involves the interpretation of the pertinent statutory language. Statutory interpretation is a matter of law that we review de novo. *Jametsky v. Olsen*, 179 Wn.2d 756, 761, 317 P.3d 1003 (2014).

The goal of statutory interpretation is to determine and give effect to the legislature's intent. *Id.* at 762. To determine legislative intent, we first look to the plain language of the statute. *Id.* We consider the language of the provision in question, the context of the statute in which the provision is found, and related statutes. *Protect the Peninsula's Future v. Growth Mgmt. Hr'gs Bd.*, 185 Wn. App. 959, 969, 344 P.3d 705 (2015). Undefined terms are given their plain and ordinary meaning, which can be derived from a dictionary. *Estate of Haselwood v. Bremerton Ice Arena, Inc.*, 166 Wn.2d 489, 498, 210 P.3d 308 (2009). If a statute is

unambiguous, we apply the statute's plain meaning as an expression of legislative intent without considering other sources of such intent. *Jametsky,* 179 Wn.2d at 762.

If the plain language of the statute is susceptible to more than one reasonable interpretation, the statute is ambiguous. *Id.* We resolve ambiguity by considering other indications of legislative intent, including principles of statutory construction, legislative history, and relevant case law. *Id.*

3.   Statutory Language: Land Use Control Ordinances

RCW 19.27.095(1) and RCW 58.17.033(1) both provide that building permit and land division applications must be considered under the "zoning or other land use control ordinances" in effect at the time the application is submitted. Neither statute defines the term "land use control ordinance." However, the appellants rely on Washington cases that do define the term and on this court's holding in *Westside Business Park, LLC v. Pierce County*, 100 Wn. App. 599, 607, 5 P.3d 713 (2000) to support their contention that stormwater drainage ordinances are land use control ordinances.

a.   *New Castle* and *Westside*

In *New Castle Investments v. City of LaCenter*, this court first discussed the meaning of "land use control ordinance" in RCW 58.17.033(1). 98 Wn. App. 224, 228, 989 P.2d 569 (1999). We focused on the word "control," which is defined in part as " '[t]he ability to exercise a restraining or directing influence over something.' " *Id.* at 229 (quoting BLACK'S LAW DICTIONARY 329 (6th ed.1990)). Accordingly, we suggested that a land use control ordinance was one that "exercise[d] a restraining or directing influence over land use." *New Castle*, 98 Wn. App. at 229. This court subsequently adopted this definition of land use control ordinance

10

in *Westside*, 100 Wn. App. at 607. Division One of this court also has adopted this definition. *Graham Neigh. Ass'n v. F.G. Assocs.*, 162 Wn. App. 98, 115, 252 P.3d 898 (2011).

In *New Castle*, we addressed whether an ordinance imposing a transportation impact fee (TIF) on a proposed subdivision was a land use control ordinance subject to the vesting rights provision of RCW 58.17.033. 98 Wn. App. at 226-27. We stated that TIFs do not exercise a controlling or restraining influence over land use; they only increase the cost of a development. *Id.* at 229. Further, we explained:

> The TIFs do not affect the physical aspects of development (i.e., building height, setbacks, or sidewalk widths) or the type of uses allowed (i.e., residential, commercial, or industrial). If they did, then TIFs would be subject to the vested rights doctrine. In other words, "[the developer] is not being forced to use its land or build differently from that which [the developer] was able to do at the time its plans were approved."

*Id.* at 237 (quoting *Lincoln Shiloh Assocs. v. Mukilteo Water Dist.*, 45 Wn. App. 123, 128, 724 P.2d 1083 (1986)). We concluded:

> Because TIFs do not "control" land use, do not affect the developer's rights with regard to the physical use of his or her land, and are best characterized as revenue raising devices rather than land use regulation, we hold that the definition of "land use control ordinances" does not include TIFs.

*Id.* at 237-38.

In *Westside*, we addressed an issue very similar to the one here – whether an ordinance imposing increased stormwater drainage requirements was a land use control ordinance subject to the vesting rights provision of RCW 58.17.033. 100 Wn. App. at 602. After relying on *New Castle* to define "land use control ordinance" as an ordinance that exerts a restraining or directing influence over land use, we stated:

11

> *Storm water drainage ordinances are land use control ordinances.* Under RCW 58.17.060, local governments may approve a short subdivision only if they enter written findings in support, as provided in RCW 58.17.110. RCW 58.17.110(1) requires, as a prerequisite to subdivision approval written findings that "appropriate provisions are made for [inter alia] drainage ways[.]" As a mandatory prerequisite to short subdivision approval, *storm water drainage ordinances do exert a "restraining or directing influence" over land use and are therefore land use control ordinances.*

*Westside*, 100 Wn. App. at 607 (emphasis added).

We also relied on *Phillips v. King County*, 136 Wn.2d 946, 963, 968 P.2d 871 (1998), where the Supreme Court stated that the vested rights doctrine applied to surface water drainage regulations. *Westside*, 100 Wn. App. at 607. We stated that "because the *Phillips* court plainly considered whether surface water drainage ordinances are within the ambit of the vested rights doctrine, . . . we are not prepared to say that storm water drainage ordinances are not subject to the vesting rule." *Id.* at 607-08.

Ecology essentially ignores *Westside*. And PSA argues that the discussion in *Westside* regarding the definition of "land use control ordinance" is dicta and the case neither controls nor is informative here because the deciding issue was the adequacy of an application to invoke vesting.[8] However, even if our discussion of the meaning of "land use control ordinance" in *Westside* was dicta, PSA does not explain why we should disregard the adoption of a definition of that term in *New Castle*, which we cited with approval in *Westside*.

Here, there is no indication that the effect of the stormwater regulations the 2013-2018 Permit requires would be appreciably different than the stormwater drainage ordinances

---

[8] Similarly, the Board ruled that *Westside* was inapplicable and adopted its prior discussion in *Rosemere Neighborhood Ass'n v. Department of Ecology*, No. 10-013, 2010 WL 3420570, at * 2 (Wash. Pollution Control Hr'gs Bd. Aug. 26, 2010).

discussed in *Westside*. Therefore, in the absence of some reason to treat the regulations adopted pursuant to the 2013-2018 Permit differently than other stormwater drainage ordinances, we hold that *Westside* is controlling authority.

Further, the type of stormwater ordinances required under the 2013-2018 Permit clearly would satisfy *Westside*'s definition of "land use control ordinance." The 2013-2018 Permit requirements by their very design are intended to exert a restraining and directing influence over the development and redevelopment of land to effectuate Ecology's regulation of stormwater discharges into Washington's waters. Certain project developers must comply with local ordinances enacted under the 2013-2018 Permit requiring, for example, that they utilize source control best management practices, implement on-site stormwater best management practices, and implement flow control standards to reduce the impacts of stormwater runoff. These and other 2013-2018 Permit requirements would significantly curtail how developers use their land.

b.    Ecology Arguments

Ecology argues that stormwater regulations adopted as required in the 2013-2018 Permit are not land use control ordinances for several reasons. First, Ecology argues that because the 2013-2018 Permit's required regulations are environmental regulations, they cannot be considered land use control ordinances. Ecology points out that the purpose of the regulations adopted pursuant to the 2013-2018 Permit is to control pollution discharges, not control the use of land. The Board's summary judgment order also focused on the purpose of the regulations at issue:

> The conditions that are imposed pursuant to the Phase I and Phase II Permits exist and are designed to address pollution, not to control the use of land. The authority for these conditions is contained in state and federal environmental laws, not any

land use-related statute. The requirement to use various best management practices to control stormwater runoff from new development or redevelopment, . . . does not change the type of use the land may be put to (residential, commercial, etc[.]), nor is it a tool to regulate the subdivision of land. Rather, the requirements of the Phase I and II Permits are, by their nature, aimed at improving the quality of the environment and the beneficial uses of the state's waters for the public at large.

CP at 57-58.

Ecology's argument seems to be based on the assumption that a regulation can either be an environmental regulation or a land use control regulation, but not both. However, Ecology does not cite any case authority for this proposition. And several cases address the application of the vested rights doctrine to regulations that can be classified as "environmental." *See, e.g.*, *Lauer v. Pierce County*, 173 Wn.2d 242, 258-263, 267 P.3d 988 (2011) (watercourse buffer regulations); *Phillips*, 136 Wn.2d at 951 (water drainage regulations); *Julian v. City of Vancouver*, 161 Wn. App 614, 619, 626-28, 255 P.3d 763 (2011) (riparian buffer regulations); *Westside*, 100 Wn. App. at 601 (storm drainage regulations adopted in part as a response to the CWA). Nothing in Washington case law suggests that simply characterizing a land use control ordinance as an environmental ordinance limits the application of the vested rights doctrine.

Ecology emphasizes that the Board has held that NPDES permit requirements do not constitute land use control ordinances. *See Rosemere Neigh. Ass'n. v. Dep't of Ecology & Clark County,* No. 10-103, 2010 WL 3420570 (Wash. Pollution Control Hr'gs Bd. Aug. 26, 2010), *affirmed*, *Clark County v. Rosemere Neigh. Ass'n*, 170 Wn. App. 859, 875-76, 290 P.3d 142 (2012) (refraining from addressing the legal vesting issue); *Cox v. Dep't of Ecology*, No. 08-077, 2009 WL 542494 (Wash. Pollution Control Hr'gs Bd. Feb. 26, 2009). However, we are not bound by an agency's interpretation of a statute. *Postema*, 142 Wn.2d at 77. Here, the Board's

rulings are inconsistent with the language of the vested rights statutes, which do not carve out an exception for environmental regulations, and applicable case law.

Second, Ecology quotes language from *New Castle* that " '[t]he vested rights rule is generally limited to those laws which can loosely be considered 'zoning' laws.' " 98 Wn. App. at 232 (quoting WASH. STATE BAR ASS'N, WASHINGTON REAL PROPERTY DESK BOOK, § 97.8(2)(d) (3d ed. 1996)). Ecology argues that environmental regulations do not resemble zoning laws. Although we quoted the same language in *Westside*, we then noted that the vested rights doctrine "has also been extended beyond zoning-type laws." 100 Wn. App. at 607. And the definition of land use control ordinance in *Westside* focused on the effect of an ordinance on land use, not on any similarity to zoning laws. *Id.* Further, RCW 19.27.095(1) and RCW 58.17.033(1) both refer to "zoning or other land use control ordinances." This language clearly establishes that a land use control ordinance is different than a zoning ordinance.

Third, Ecology argues that the purpose of the vested rights doctrine is only to limit the exercise of municipal discretion, rather than limiting the state's ability to implement environmental regulations necessary to comply with state and federal water pollution laws. Ecology relies on *Erickson & Assocs., Inc. v. McLerran*, where the Supreme Court recognized that:

> [o]ur vested rights doctrine is not a blanket rule requiring cities and towns to process all permit applications according to the rules in place at the outset of the permit review. Instead, the doctrine places limits on municipal discretion and permits landowners or developers "to plan their conduct with reasonable certainty of the legal consequences."

123 Wn.2d 864, 873, 872 P.2d 1090 (1994) (quoting *West Main Assocs. v. City of Bellevue*, 106 Wn.2d 47, 51, 720 P.2d 782 (1986)). Ecology states that permittees do not

exercise municipal discretion when they implement environmental conditions imposed by the state to meet water pollution laws.

However, *Erickson* does not stand for the proposition that the vested rights doctrine applies only to limit municipal discretion and cannot apply to environmental requirements enacted pursuant to state direction. The language quoted above addressed an ordinance that determined the vesting date of certain permits, not land use control ordinances. *Erickson*, 123 Wn.2d at 869-71. And Ecology cites to no authority holding that the vested rights statutes do not apply to local regulations that are state mandated.[9] Those statutes broadly apply to land use control ordinances without any exception for ordinances mandated by state or federal law. *See Westside*, 100 Wn. App. at 601 (recognizing a vested right to the application of the predecessor to stormwater drainage ordinances adopted in response to the CWA).

Fourth, Ecology argues that controlling water pollution is an exercise of a local municipality's police powers, which extinguishes a developer's vested right. Ecology quotes a 1905 case stating that "[t]here is no such thing as an inherent or vested right to imperil the health or impair the safety of the community." *City of Seattle v. Hinckley*, 40 Wash. 468, 471, 82 P. 747 (1905). Ecology also relies on *Rhod-A-Zalea & 35th, Inc. v. Snohomish County*, 136 Wn.2d 1, 6, 959 P.2d 1024 (1998), where the Supreme Court

---

[9] Ecology cites only to *Citizens for Rational Shoreline Planning v. Whatcom County*, 172 Wn.2d 384, 389, 258 P.3d 36 (2011) to support its argument. But that case involved RCW 82.02.020, which has explicit language stating that it applies only to taxes imposed by local government, not by the state. *Citizens for Rational Shoreline Planning*, 172 Wn.2d at 390. RCW 19.27.095(1) and RCW 58.17.033(1) have no similar language.

addressed whether a nonconforming peat mining operation was subject to a county's police power regulations enacted for the health, safety, and welfare of the community. The court held that the peat mining operation was subject to subsequent police power regulations and that local governments may "preserve, regulate and even, within constitutional limitations, terminate nonconforming uses." *Id.* at 8. Ecology emphasizes that the court suggested that a nonconforming factory would not be exempt from later enacted pollution regulations. *Id.* at 15.

However, Ecology did not argue below that the stormwater regulations may be enacted pursuant to a municipality's police powers. And the Board did not address this issue. Therefore, whether a local municipality could impose police power conditions on a development application is not before us. The only issue on appeal is the application of the vested rights doctrine.

Fifth, Ecology argues that it could require permittees to use their authority under SEPA to enforce stormwater discharge regulations. SEPA regulations are exempt from the vested rights doctrine. RCW 19.27.095(6); RCW 58.17.033(3). However, once again Ecology did not argue below that it was requiring permittees to enact regulations pursuant to SEPA. And the Board did not base its decision on SEPA. Therefore, whether a local municipality could enact certain regulations under SEPA that would not be subject to the vested rights doctrine is not before us.

Sixth, Ecology argues that applying the vested rights doctrine here would conflict with the legislature's intent, expressed in RCW 90.48.010, to "maintain the highest possible standards to insure the purity of all waters of the state. . . , and to that end

17

require the use of all known available and reasonable methods by industries and others"

to control water pollution. However, as noted above, RCW 19.27.095(6) and RCW

58.17.033(3) do not contain any exception for environmental regulations. And Ecology

has not cited to any expression of a legislative intent to have NPDES permit requirements

supersede the vested rights doctrine. Further, to the extent that RCW 90.48.010 and the

vested rights statutes conflict, the more general policy statement in RCW 90.48.010 must

yield to the more specific vested rights statutes. *See Ass'n of Wash. Spirits & Wine

Distribs. v. Wash. State Liquor Control Bd.*, 182 Wn.2d 342, 356, 340 P.3d 849 (2015)(a

general statutory provision must yield to a more specific provision).

      c.    Summary

Under a plain reading of RCW 19.27.095(1) and RCW 58.17.033(1), in combination with

our case law interpreting these provisions, regulations enacting the 2013-2018 Permit

requirements constitute local land use ordinances because the regulations will restrain and direct

the use of land. Because development rights vest upon filing a completed building or land

division application, condition S5.C.5.a.iii conflicts with the vested rights doctrine as stated in

RCW 19.27.095(1) and RCW 58.17.033(1) because it could require a permittee to enforce

regulations adopted after development rights had been vested. Accordingly, we hold that

condition S5.C.5.a.iii of the 2013-2018 Permit is invalid.

      4.    Statutory Language: Development Standards and Regulations

RCW 36.70B.180 provides that a development agreement is not subject to an amended or

new "zoning ordinance or development standard or regulation adopted after the effective date of

the agreement." The statute does not define "development standard or regulation." And there

are no cases or statutes that define this term. However, the ordinary meaning of "development regulation" is a regulation that affects the development of land. Using this meaning, there is no reason to interpret development regulation differently than land use control ordinance. Similarly, the ordinary meaning of "development standards" is a standard that affects the development of land. Although "standard" may have a narrower meaning than "regulation," again there is no reason to interpret development standards differently than land use control ordinances.

We hold that under a plain reading of RCW 36.70B.180, local regulations enacting the 2013-2018 Permit requirements constitute development regulations and development standards. Accordingly, we hold that condition S5.C.5.a.iii conflicts with the vested rights doctrine as stated in RCW 36.70B.180, and therefore is invalid.[10]

5. Remedy

We hold that condition S5.C.5.a.iii of the 2013-2018 Permit conflicts with RCW 19.27.095(1), RCW 58.17.033(1), and RCW 36.70B.180. The appellants contend that this holding requires us to find that condition S5.C.5.a.iii is invalid because the Washington legislature did not provide Ecology with the authority to compel permittees to violate Washington law and to do so would be unreasonable. We agree.

An administrative regulation that conflicts with a statute is invalid. *See Cannabis Action Coal. v. City of Kent*, 180 Wn. App. 455, 481, 322 P.3d 1246 (2014). Such a conflict exists when an ordinance permits what state law forbids or forbids what state law permits. *Id.* at 482.

---

[10] Snohomish County also argues that compliance with condition S5.C.5.a.iii could require permittees to violate Washington's doctrine of finality of land use decisions for land use applications actually approved before January 1, 2015. Because we reverse based on the vested rights doctrine, we do not address this issue.

" 'The conflict must be direct and irreconcilable with the statute, and the ordinance must yield to the statute if the two cannot be harmonized.' " *Id.* (quoting *City of Tacoma v. Luvene*, 118 Wn.2d 826, 835, 827 P.2d 1374 (1992)).

Here, condition S5.C.5.a.iii requires that permittees apply the new 2013-2018 Permit requirements to completed building and subdivision permit applications and executed development agreements that were submitted before July 1, 2015 that have not started construction by June 30, 2020. The vesting rights statutes provide that certain land development projects must be processed under the land use or development regulations in effect at the time the completed building or land division application is submitted or the effective date of the development agreement regardless of when construction starts. Therefore, there is a direct conflict between the condition and the statutory provisions because condition S5.C.5.a.iii requires imposition of new regulations on those applications and agreements that had development rights vested before the new regulations were adopted.

The proper remedy is to reverse the Board's order and remand to the Board to direct Ecology to revise condition S5.C.5.a.iii to specify that the 2013-2018 Permit applies only to those completed applications submitted after permittees adopted the new Permit requirements. *See Puget Soundkeeper Alliance v. State*, 189 Wn. App. 127, 131, 152, 356 P.3d 753 (2015) (reversing Board order and remanding to Ecology to revise permit condition).

D.      FEDERAL PREEMPTION

Ecology argues that even if Washington's vested right doctrine applies to the 2013-2018 Permit's required regulations, the federal CWA preempts that doctrine. Ecology contends that preemption applies here because the application of the vested rights doctrine to the 2013-2018

20

Permit requirements would prevent accomplishing the purposes and objectives of Congress. We disagree and hold that the CWA does not preempt Washington's vested rights doctrine.

1.    Legal Principles

The Supremacy Clause of the United States Constitution gives the federal government the power to preempt state law. *Hillman v. Maretta*, ___ U.S. ___, 133 S. Ct. 1943, 1949, 186 L. Ed. 2d 43 (2013). "Conflict preemption" occurs when (1) federal and state laws conflict, making compliance with both an impossibility, or (2) state law " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Id.* at 1950 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S. Ct. 399, 85 L. Ed. 581 (1941)). "[S]tate laws are not superseded by congressional legislation unless that is the clear and manifest purpose of Congress." *McKee v. AT&T Corp.*, 164 Wn.2d 372, 387, 191 P.3d 845 (2008). Courts should not seek out conflict where none actually exists. *Chevron U.S.A., Inc. v. Hammond*, 726 F.2d 483, 499 (9th Cir. 1984).

Significantly, there is a strong presumption against preemption under Washington law. *Nw. Wholesale, Inc. v. Pac Organic Fruit, LLC*, 184 Wn.2d 176, 184, 357 P.3d 650 *pet. for cert. filed sub nom. Ostenson v. Holzman*, No. 15-763 (U.S. Dec. 9, 2015). "Preemption is the exception, not the rule in Washington." *Hisle v. Todd Pac. Shipyards Corp.*, 151 Wn.2d 853, 864, 93 P.3d 108 (2004).

We review federal preemption issues de novo. *Wal-Mart Stores, Inc. v. United Food & Commercial Workers Int'l Union*, 190 Wn. App. 14, 21, 354 P.3d 31 (2015).

2.    No Direct Conflict Between State and Federal Law

Washington's vested rights doctrine does not *directly* conflict with the CWA.  The CWA does not provide that state agencies must require local municipalities to enact certain stormwater regulations applicable to land development.  Instead, Congress has delegated implementation of general pollution control guidelines to the states.  As a result, the requirements of condition S5.C.5.a.iii reflect Ecology's interpretive choices meant to effectuate a framework of federal and state environmental guidelines.  Further, there is no counterpart to condition S5.C.5.a.iii in the CWA.  And nothing in the CWA requires that stormwater regulations be applied within a set deadline.  Accordingly, we hold that the CWA does not directly conflict with Washington's vested rights doctrine.

3.    Obstacle to Congressional Objectives

Ecology argues that the second prong of conflict preemption applies here.  To determine whether this prong applies, we must determine the purposes and objectives of Congress that are embodied in the CWA and determine whether the vested rights doctrine stands as an obstacle to the accomplishment of those objectives. *Beatty v. Fish & Wildlife Comm'n*, 185 Wn. App. 426, 454, *review denied*, 183 Wn.2d 1004 (2015).  "The obstruction strand of conflict preemption focuses on both the objective of the federal law and the method chosen by Congress to effectuate that objective." *McKee*, 164 Wn.2d at 388.

a.    Objective of CWA

The CWA is a comprehensive water quality statute with the stated goal of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters" and achieving or maintaining "water quality which provides for the protection and propagation of

fish, shellfish, and wildlife." 33 U.S.C. §1251(a)(2). Under the statute, the administrator of EPA is charged with the responsibility of "establish[ing] and enforc[ing] technology-based limitations on individual discharges into the country's navigable waters from point sources." *PUD No. 1 of Jefferson County v. Wash. Dep't of Ecology*, 511 U.S. 700, 704, 114 S. Ct. 1900, 128 L. Ed. 2d 716 (1994) (citing 33 U.S.C. §§ 1311, 1314). The states also are required to provide water quality standards, which may be more stringent than the federal standards but cannot be less protective than the federal standards. *Jefferson County*, 511 U.S. at 705; 33 U.S.C. § 1370.

The key provision of the CWA regarding stormwater pollution is 33 U.S.C. § 1342(p)(3)(B)(iii), which states that permits issued for discharges from municipal storm sewers "shall require controls to reduce the discharge of pollutants to the maximum extent practicable." Ecology argues that the stormwater requirements in the 2013-2018 Permit will reduce the discharge of pollutants to the maximum extent practicable, and therefore allowing the vested rights doctrine to prevent application of these requirements to certain developments would be an obstacle to the accomplishment of the objectives of 33 U.S.C. § 1342(p)(3)(B)(iii).

However, 33 U.S.C. § 1342(p)(3)(B)(iii) does not require controls to reduce the discharge of pollutants to the maximum extent *possible*. Congress used the word "practicable." 33 U.S.C. § 1342(p)(3)(B)(iii). This language necessarily provides some flexibility to the states in adopting stormwater control regulations. Consistent with 33 U.S.C. § 1342(p)(3)(B)(iii), a state may legitimately determine that it is not "practicable" to impose new NPDES permit requirements on those projects with development applications that have already vested under state law.

Further, as noted above, the CWA contains no timeline for adopting controls to reduce the discharge of pollutants. The absence of any directive requiring the adoption of new

regulations within a specific timeframe necessarily provides some flexibility to the states in implementing stormwater control regulations. Ecology itself recognized this flexibility by delaying the application of the 2013-2018 Permit requirements until 2020 for development applications filed before July 1, 2015. Ecology does not suggest that this five year delay violates 33 U.S.C. § 1342(p)(3)(B)(iii) or interferes with Congressional objectives. If delaying the application of 2013-2018 Permit requirements until 2020 for some developments is acceptable under federal law, we cannot agree that delaying the application of 2013-2018 Permit requirements for a few more years in the present context to fully protect vested development rights interferes with Congressional objectives.

    b.  Method Chosen by Congress

In enacting the CWA, Congress chose not to adopt rigid requirements for the immediate elimination of the discharge of pollutants to stormwater collection systems. Instead, Congress developed the NPDES permit program to gradually reduce such discharges. This choice suggests that some delay in the implementation of NPDES permit requirements would not necessarily prevent the accomplishment of Congress's broad purposes and objectives. As the United States Supreme Court noted, "[b]y establishing a permit system for effluent discharges, Congress implicitly has recognized that the goal of the CWA – elimination of water pollution – cannot be achieved immediately." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494, 107 S. Ct. 805, 93 L. Ed. 2d 883 (1987).

Further, Congress did not retain control over the specific terms of NPDES permits. Instead, Congress provided EPA with the authority to delegate the NPDES permit program to approved state agencies, with the requirement that state standards not fall below federal

standards. 33 U.S.C. § 1370. This delegation suggests that Congress intended that the implementation of CWA objectives would occur within the framework of state law, not that it intended to preempt state law. Although the application of Washington's vested rights doctrine may delay the application of Ecology's current permit requirements for a limited number of developments, the doctrine itself does not prevent the accomplishment of Congress's broad purposes and objectives.

Given the strong presumption against preemption under Washington law, we hold that that the CWA does not preempt Washington's statutory vested rights doctrine.

We reverse the Board's order and remand to the Board to direct Ecology to revise condition S5.C.5.a.iii in the 2013-2018 Phase I Municipal Stormwater Permit to specify that the 2013-2018 Permit applies only to those completed applications submitted after July 1, 2015.

_____
MAXA, J.

I concur:

_____
LEE, J.

No. 46378-4-II

BJORGEN, J. (dissenting) — The application of the vested rights doctrine proposed by Snohomish County, King County, and the Building Industry Association of Clark County (collectively appellants), in my view, is both preempted by federal law and in conflict with governing state law. Therefore, I would affirm the decision of the Pollution Control Hearings Board (Board).

## I. FEDERAL PREEMPTION

The issue in this appeal is whether the state vested rights doctrine excuses a specific class of applicants from compliance with new storm water regulations adopted by local governments to implement the 2013-2018 Phase I Municipal Storm Water NPDES[11] permit (2013-2018 Permit). The class at issue comprises those who filed a complete development application before July 1, 2015, but who will not have started construction by June 30, 2020. The 2013-2018 Permit and the Board's ruling upholding it deems them subject to the new regulations. The appellants urge that the state's vested rights doctrine shields those applicants from the reach of the new regulations.

The pulse of the federal Clean Water Act (CWA) is set by 33 U.S.C. 1311(a), which bans the discharge of any pollutant from a point source into the nation's navigable waters, unless within applicable standards and subject to a permit. *See also* 33 U.S.C. 1312, 1316-17, 1328, 1342, 1344. The principal permit under the CWA is the NPDES permit. The federal government has delegated the authority to issue NPDES permits in Washington to the state Department of Ecology (Ecology). *See* RCW 90.48.260.

---

[11] National Pollutant Discharge Elimination System.

Of the various types of discharges,

[s]tormwater runoff is one of the most significant sources of water pollution in the nation, at times comparable to, if not greater than, contamination from industrial and sewage sources. Storm sewer waters carry suspended metals, sediments, algae-promoting nutrients (nitrogen and phosphorus), floatable trash, used motor oil, raw sewage, pesticides, and other toxic contaminants into streams, rivers, lakes, and estuaries across the United States. . . . Urban runoff has been named as the foremost cause of impairment of surveyed ocean waters.

*Envtl. Def. Ctr., Inc. v. United States Envtl. Prot. Agency*, 344 F.3d 832, 840-41 (9th Cir. 2003) (footnotes and internal quotation marks omitted). To implement CWA requirements, Ecology issued the 2013-2018 Permit authorizing discharges from large and medium municipal storm water systems, subject to standards and conditions. Of those, Condition S5.C.5 imposes new requirements on specified land development, including source control, flow control, and treatment, among others. Under this condition, local governments covered by the 2013-2018 Permit must adopt plans and regulations imposing these requirements on development proposals by June 30, 2015. At the heart of this appeal, Condition S5.C.5.a.iii states that these plans and regulations shall apply to all applications submitted after June 30, 2015 "and shall apply to applications submitted no later than June 30, 2015, which have not started construction by June 30, 2020."

Subject to the intricacies and exceptions unpacked by the case law, vesting

refers generally to the notion that a land use application, under the proper conditions, will be considered only under the land use statutes and ordinances in effect at the time of the application's submission.

*Noble Manor Co. v. Pierce County,* 133 Wn.2d 269, 275, 943 P.2d 1378 (1997). As noted, the 2013-2018 Permit required local governments to adopt new storm water regulations by June 30, 2015. With that, appellants argue, the Permit violates the vested rights doctrine, since Condition

S5.C.5.a.iii imposed those new regulations on applications submitted *before* that date, as long as construction will not have started by June 30, 2020.  Whether the appellants are correct in this, however, need not detain the analysis, since relieving this class of applicants from compliance with the new regulations is preempted by the CWA.

State law is preempted "'to the extent of any conflict with a federal statute.'" <u>Hillman v. Maretta</u>, __ U.S. __, 133 S. Ct. 1943, 1949-50, 186 L. Ed. 2d 43 (2013) (quoting *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 372, 120 S. Ct. 2288, 147 L. Ed. 2d 352 (2000)).  Conflict preemption occurs "when compliance with both federal and state regulations is impossible . . . or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Hillman*, 133 S. Ct. at 1950 (internal citations omitted) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S. Ct. 399, 85 L. Ed. 2d 581 (1941)).

The objective of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" and to achieve or maintain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife." 33 U.S.C. § 1251(a); *Pub. Util. Dist. No. 1 of Jefferson County v. Washington Dep't of Ecology*, 511 U.S. 700, 704, 114 S. Ct. 1900, 128 L. Ed. 2d 716 (1994).  To serve this goal, the CWA broadly prohibits "the discharge of any pollutant by any person," except as authorized by enumerated statutory provisions.  33 U.S.C. § 1311(a); *Puget Soundkeeper Alliance v. State, Pollution Control Hr'gs Bd.*, 189 Wn. App. 127, ¶18, 356 P.3d 753 (2015).  More specifically, the CWA mandates that permits for discharges from municipal storm sewers require controls to reduce the discharge of pollutants to "the maximum extent practicable."  33 U.S.C. § 1342(p)(3)(B).

State agencies may not issue NPDES permits

> [w]hen the conditions of the permit do not provide for compliance with the applicable requirements of CWA, or regulations promulgated under CWA; . . . [or w]hen the imposition of conditions cannot ensure compliance with the applicable water quality requirements of all affected States.

40 C.F.R. § 122.4(a), (d) (alteration in original). Washington law makes clear that these requirements apply to each discharge: WAC 173-220-150(1)(c) provides that "each issued [NPDES] permit shall require that . . . [a]ny discharge of any pollutant . . . at a level in excess of that identified and authorized by the permit shall constitute a violation of the terms and conditions of the permit." *Puget Soundkeeper*, 189 Wn. App. at ¶ 20.

The appellants do not argue that the specific standards of the 2013-2018 Permit are not strict enough to serve the CWA's purposes. Therefore, they do not dispute that the 2013-2018 Permit is a method of achieving the "maximum extent practicable" standard of 33 U.S.C. § 1342(p)(3)(B). Similarly, the Board concluded in its findings of fact, conclusions of law and order, dated March 21, 2014 (2014 decision), that the 2013-2018 Permit's low-impact development requirements, including those covering permeable pavement, bioretention, and the phasing of watershed basin planning "constitute . . . MEP," which is the abbreviation for "maximum extent practicable." Clerk's Papers at 248.

Against this background, one must conclude that the permit's standards are reasonably necessary to reduce the discharge of pollutants to "the maximum extent practicable," as required by federal law. Among those standards is the one at issue here: that the Permit's substantive requirements apply to projects for which applications were filed before July 1, 2013, but which will not have commenced construction by June 30, 2020. Similarly, one must conclude that this

temporal choice of law provision is also reasonably necessary to meet the "maximum extent practicable" standard of 33 U.S.C. § 1342(p)(3)(B).

The state's vested rights doctrine would directly obstruct these federal purposes. Under the permit, projects with applications submitted before July 1, 2015 and which did not commence construction by 2020 would be subject to the standards of the 2013-2018 Permit. Under the vested rights doctrine as expounded by appellants, projects within this window would escape those standards. Thus, the proposed application of the doctrine would result in greater discharge of pollutants into receiving waters and consequent greater compromise to the purity of those waters. While the CWA may not require choosing the least polluting of all conceivable alternatives in every situation, it does require that permits for municipal storm sewers reduce the discharge of pollutants to "the maximum extent practicable." 33 U.S.C. § 1342(p)(3)(B). Applying the vested rights doctrine as appellants urge would frustrate the achievement of that standard, since, as shown above, subjecting projects within this window to the specific controls of the 2013-2018 Permit is a part of the Permit's reduction of polluting discharges to the maximum extent practicable.

The United States Congress recognized that the goals of the CWA cannot be achieved immediately, setting in 33 U.S.C 1251(a)(1) the goal that the discharge of pollutants into the navigable waters be eliminated by 1985. Thirty years have now passed since the 1985 deadline. To use the flexibility shown by that deadline as a license for further delay thirty years after its expiration is to risk passage into the absurd. Because application of the vested rights doctrine would frustrate accomplishment of the federal purposes, it is preempted under *Hillman*, 133 S. Ct. at 1950.

## II. CONFLICT WITH STATE LAW

The policy of the water pollution control statute at chapter 90.48 RCW is "to maintain the highest possible standards to insure the purity of all waters . . . and to that end require the use of all known, available and reasonable methods by industries and others to prevent and control the pollution of the waters of the state of Washington." RCW 90.48.010. Similarly, RCW 90.54.020(3)(b) states:

> Regardless of the quality of the waters of the state, all wastes and other materials and substances proposed for entry into said waters shall be provided with all known, available, and reasonable methods of treatment prior to entry . . . wastes and other materials and substances shall not be allowed to enter such waters which will reduce the existing quality thereof, except in those situations where it is clear that overriding considerations of the public interest will be served.

These designs are also reflected in the state anti-degradation policy to "[r]estore and maintain the highest possible quality of the surface waters of Washington" and to "[e]nsure that all human activities that are likely to contribute to a lowering of water quality, at a minimum, apply all known, available, and reasonable methods of prevention, control, and treatment (AKART)." WAC 173-201A-300(2)(a), (d).

Conclusions 10, 17 and 43 of the Board's 2014 decision determined that the 2013-2018 Permit's low-impact development requirements, including those covering permeable pavement, bioretention, and the phasing of watershed basin planning "constitute AKART." The 2013-2018 Permit thus would require AKART of projects with applications submitted before July 1, 2015, and which did not commence construction by June 30, 2020. The theory of the vested rights doctrine urged by appellants would relieve that class of projects from the duty to provide AKART. Thus, this application of the vested rights doctrine would conflict with RCW

90.48.010, RCW 90.54.020(3)(b), and WAC 173-201A-300 (2). The proper resolution of that conflict depends on the source of the vested rights doctrine.

In *West Main Associates v. City of Bellevue*, 106 Wn.2d 47, 51, 720 P.2d 782 (1986), our Supreme Court struck down Bellevue's local vesting ordinance, because it did not meet the due process standards of the Fourteenth Amendment. *West Main*, 106 Wn.2d at 52. The ordinance provided that rights would vest only upon filing a building permit application, but prohibited the filing of such an application until up to eight other permits or reviews had been approved. *Id.* at 49. The ordinance further barred filing a building permit application until any appeal of four of these other approvals had been resolved. *Id.* Not surprisingly, the court found this artifice to be unconstitutional. The court, however, did not hold that the state's general vesting rule, that projects are subject to the law in effect when a complete application is filed, is compelled by either the state or federal constitution. To do so would have approached the extremity of implying that the reliance-based vesting rule current in the great majority of states was unconstitutional. More recently, our Supreme Court held in *Town of Woodway v. Snohomish County*, 180 Wn.2d 165, 173, 322 P.3d 1219, *remanded*, 2014 WL 6968436 (May 2014), that "[w]hile it originated at common law, the vested rights doctrine is now statutory." *Accord, Potala Vill. Kirkland, LLC v. City of Kirkland*, 183 Wn. App. 191, 202, 334 P.3d 1143 (2014), *review denied*, 182 Wn.2d 1004 (2015). Although arbitrarily fluctuating governmental standards may scant the degree of fairness required by the constitution, our minority vesting doctrine is not constitutionally required medicine for that problem.

For these reasons, the conflict between the appellants' view of the vested rights doctrine and state water quality law must be analysed as a conflict between two statutes. When faced

with apparently conflicting statutes, we employ a two-step process. *See Gorman v. Garlock, Inc.*, 155 Wn.2d 198, 210, 118 P.3d 311 (2005). First, we examine whether the statutes can be harmonized and effect given to both. *City of Lakewood v. Pierce County*, 106 Wn. App. 63, 71, 23 P.3d 1 (2001). Then, if the statutes truly conflict and cannot be reconciled, we give preference to a more specific or more recently enacted statute. *Tunstall ex rel. Tunstall v. Bergeson*, 141 Wn.2d 201, 211, 5 P.3d 691 (2000).

Turning to the first step, the conflict between the two positions seems beyond the reach of harmonization: one would exempt a certain class of projects from the new standards and one would not. Chronology likewise is of little help. On one hand, the antecedents of RCW 90.48.010 go back to 1945, although its modern form was enacted in the early 1970s. Chapter 90.54 RCW was enacted in 1971. The lineage of WAC 173-201A-300 is more recent. *See* WSR 03-14-129. On the other hand, the two principal vesting statutes, RCW 19.27.095 (building permits) and RCW 58.17.033 (preliminary subdivision approval), were each enacted in 1987.

A better window into legislative intent lies in the nature of the competing statutes. The vested rights doctrine is a general rule covering all development within its scope, without specific regard to the effects or interests at stake. RCW 90.48.010 and WAC 173-201A-300, in contrast, are aimed at protecting a specific resource, the waters of the state, from a specific threat, pollution. Chapter 90.54 RCW is of similarly focused scope, directed at ensuring the proper utilization of the state's water resources. RCW 90.54.010. These measures were enacted pursuant to legislative recognition of the value of the resource and the presence of the threat. RCW 90.48.010; RCW 90.54.010. The narrowed circumference of both focus and purpose in

the water quality measures suggests that within those bounds the more general vesting doctrine must give way.

This conclusion flows also from our Supreme Court's view of the purpose of the vested rights doctrine. In *West Main* the court held that the purpose of the vesting doctrine is to allow developers to determine, or "fix," the rules that will govern development. 106 Wn. 2d at 51. The court then took a more nuanced view in *Erickson & Associates, Inc. v. McLerran*, 123 Wn.2d 864, 873-74, 872 P.2d 1090 (1994), recognizing that

> [t]he practical effect of recognizing a vested right is to sanction the creation of a new nonconforming use. A proposed development which does not conform to newly adopted laws is, by definition, inimical to the public interest embodied in those laws. If a vested right is too easily granted, the public interest is subverted.

To use the vested rights doctrine to exempt from compliance those who filed before July 1, 2015, but who still have not begun construction over five years later, is to engage in the sort of subversion of the public interest against which *Erickson* warned. Reversing the defilement of our public waters stands high in any ranking of public interest. On the other hand, the public interest in allowing applicants to proceed under the standards current when they applied declines with time, as those standards become more obsolete and the excuses for inaction become weaker. Perhaps more to the point, the 2013-2018 Permit was adopted in 2012, effective in 2013. Thus, there can be little surprise in applying the permit's standards to those applying before July 1, 2015.

The purposes of the vested rights doctrine and our clean water laws are not in equipoise. The scrutiny of those purposes, as well as the specific nature of the latter, shows that protection of the state's waters must prevail in its conflict with the vested rights doctrine. By relieving a

class of projects from the duty to provide AKART, the vested rights doctrine would conflict with

RCW 90.48.010, RCW 90.54.020(3)(b), and WAC 173-201A-300 (2). In resolving that conflict,

these statutes have the last word.

## III. CONCLUSION

For the reasons set out above, I would affirm the order of the Board.[12]

_____, A.C.J.
BJORGEN, J.

---

[12] This opinion does not examine whether the vested rights doctrine would apply in these circumstances in the absence of federal preemption or conflict with state statutes.